# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

JONATHAN ADAMS, AS
ADMINISTRATOR OF THE
ESTATE OF GARY C. ADAMS,

    Plaintiff,

vs.                    CIVIL ACTION NO: 3:10-CV-00605

MARATHON PETROLEUM CO., LLC.,
MARATHON OIL COMPANY,
JOHN DOE AND JOHN DOE
CORPORATION, an unknown
individual and corporation,

    Defendants.


* * * * * * * * * * * * * * * * * * * * * * * * * * * *


       The deposition of DONALD LEE BENDER was taken on the 14th day of October, 2010, commencing at 2:40 p.m., at the Law Offices of Nelson Mullins, 949 Third Avenue, Suite 200, Huntington, West Virginia, before Alex Koutsunis, a Court Reporter and Notary Public in and for the State of West Virginia, pursuant to notice in the above-styled matter which is now pending and undetermined in said Court.


ALEX KOUTSUNIS
AAA COURT REPORTING SERVICE
401 11th Street, Suite 504 -- P. O. Box 2043
Huntington, WV  25701 -- (304) 523-4300

99439 v_01 \ 052592.0121

Donald Bender                                                                    45

```
 1   wheelhouse and went down where?
 2        A     I went directly to my room and put clothes
 3   on.
 4        Q     After that, where did you go?
 5        A     After I got clothes on, I ran directly to
 6   the stern of the boat.
 7        Q     And when you got there, what was going on?
 8        A     When I got to the stern of the boat, I
 9   assessed the situation, which was the guys were holding
10   the handy line that connects itself to the life ring.
11   Gary was already underneath the boat.  There was a
12   couple of guys on the handy line trying to pull the life
13   ring back upriver.  They could not budge it.  I grabbed
14   the fire ax and was going to chop the line, cut the line
15   off from the stern of the boat.  When I got turned
16   around and looked and assessed the situation further, I
17   gave the fire ax to one of the deck crew to chop it off
18   of the barge, because if I had chopped the line off at
19   the boat, it would have put the crew in danger.
20        Q     Because it would have backlashed and --
21        A     Yes, sir.
22        Q     -- and potentially hit somebody?
23        A     Yes, sir.  It would have backlashed
```

Donald Bender                                                         46

1   directly into their path.  So as I was the only one on
2   the stern of the boat, I got out of the way and they
3   chopped it off from the barge itself.
4        Q    Who had hold of the line when you got down
5   there, do you remember?
6        A    No, sir.  I don't remember who all had hold
7   of the line.  I know pretty much the whole deck crew was
8   there.  I don't remember who I handed the fire ax to.  I
9   just remember they were all over there pulling and
10  tugging and trying to get Gary back out from underneath
11  the boat.
12       Q    So after you cut the line, what happened
13  next?
14       A    We cut the line and the boat started to
15  drift downriver, and as we started to drift, the life
16  ring popped up empty.  I then went around the side of
17  the boat to see if I could see him anywhere in the
18  river.
19       Q    Which side of the boat did you go to?  The
20  starboard side?
21       A    It would have been the starboard side.  It
22  was the outriver -- outboard side.  And I think I just
23  peered around the corner to look and then ran to the

ALEX KOUTSUNIS
AAA COURT REPORTING SERVICE

99439 v_01 \ 052592.0121

Donald Bender                                           100

1   of friends.
2       Q   At any time prior to you going off watch,
3   did you have a discussion with anybody about the mooring
4   configuration when you went off watch?
5       A   Not to my recollection.
6           MR. BISER:   That's all I have.
7                        EXAMINATION
8   BY MR. ELLIS:
9       Q   Captain, since the time you have been a
10  deckhand and perhaps before, was there a standard
11  operating procedure for releasing the stern of a vessel
12  that was moored bow upstream?
13      A   When we turn a vessel loose, when you turn
14  anything loose, barge, vessel, you start at the
15  downriver-most end, which for the configuration that we
16  were that night, would have been the stern end of the
17  Tri-State.  You go all the way down to the lowest point
18  downriver and start there and turn loose moving your way
19  back upriver.
20      Q   Why do you start at the stern-most fitting
21  even if you're not sure there's a line on it?
22      A   Because that gives you the piece of mind
23  that there is nothing there holding you in.  If you

                        ALEX KOUTSUNIS
                   AAA COURT REPORTING SERVICE

Donald Bender                                                                101

```
 1   start at the lowest end that you can put something, then
 2   you know that there's nothing there.
 3        Q    Has that been the standard procedure since
 4   you were a deckhand?
 5        A    That has been the standard procedure since
 6   I was a deckhand, and that's the way I was taught to do
 7   it from guys that started back -- longer than I have
 8   been alive.
 9        Q    That night, can you describe for me the
10   river condition?
11        A    The water was up.  There was some drift
12   running and the current was somewhere between three and
13   four miles an hour, I think, is what the official report
14   was saying.  I know it was swift.  A loaded fleet is a
15   pretty swift place over there with the river and
16   everything.
17        Q    Is three to four miles an hour a strong
18   current for the Ohio?
19        A    Yep.  Yes, it's getting pretty swift then.
20   It's something not to be taken lightly and definitely
21   pay attention to what you're doing.
22        Q    When you were talking about drift, what is
23   drift?
```

ALEX KOUTSUNIS
AAA COURT REPORTING SERVICE